IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

MARCELLE ANN ANGALL-LEONCE
and ROMANUS SYLVESTER LEONCE,
Husband and Wife,

                                       CASE NO.: 1:20-cv-00127-AW-GRJ

       Plaintiff,

v.

ON POINT TRANSPORT, INC. and
JOSEPH MISATULI LEIA,

       Defendants.

_____/

## PLAINTIFFS' RESPONSE TO DEFENDANTS MOTION TO COMPEL IN PERSON DEPOSITIONS OF PLAINTIFFS AND/OR TO ALLOW FOR ZOOM/TELEPHONIC DEPOSITIONS OF PLAINTIFFS DUE TO COVID-19 CRISIS

**COME NOW** the Plaintiffs, MARCELLE ANN ANGALL-LEONCE AND ROMANUS SYLVESTER LEONCE, Husband and Wife, by and through undersigned counsel, pursuant to Rule 30(b)(4) Federal Rules of Civil Procedure, and files their Response to Defendant's Motion to Compel In-Person Depositions of Plaintiffs, and requests an Order allowing depositions by remote means. In support thereof the following would be shown:

1.     Plaintiff agrees with the preliminary matters set forth in Defendant's Motion to Compel paragraphs 1 through 4 in that this is a personal injury case lawfully within the jurisdiction of this court and the defendants set zoom depositions of the plaintiffs by way of notice on November 18, 2020.

2.     Plaintiff disagrees with the statement by the defendants in paragraph 5 of their motion that they learned of the extent of the traumatic brain injury subsequent to November 18, 2020.

3.     On May 6, 2020, Plaintiff supplied discovery responses to the defendant in state court which included records of physicians who had treated plaintiff, Marcelle Angall-Leonce, and diagnosed her with a traumatic brain injury. A copy of Plaintiff's Response to Defendant's Request for Production is attached hereto as Exhibit A and selected notes of neurologist Marc Sharfman, MD, report from Dr. Arias and the Brain MRI scans are attached as Exhibit B and copies of email transmission to defense counsel containing these records evidencing receipt on May 6, 2020 and then again on July 20, 2020 attached as Exhibit C. Exhibit B contains the following diagnosis from Dr. Arias: "Mild Neurocognitive Disorder secondary to Traumatic Brain Injury."

4.     Defense counsel has advised that he objects to electronic depositions and insists on traditional in-person depositions where the plaintiffs must travel over 300 miles from their home in Georgia to Alachua County, Florida and are physically present in the room with the court reporter and defense counsel.

5.     Plaintiff seeks an order from the Court permitting the depositions to proceed electronically, given the current state of the pandemic.

## MEMORANDUM OF LAW

Federal Rule of Civil Procedure Rule 30(b)(4) entitled BY REMOTE MEANS states the following:

the parties may stipulate – or the court may on motion order – that a deposition be taken by telephone or other remote means....

In light of the COVID-19 epidemic, Plaintiff, MARCELLE ANN ANGALL-LEONCE, who is 60 years old and Plaintiff, ROMANUS SYLVESTER LEONCE, who is 63 years old are both in one of the highest risk categories, and request that their deposition be

conducted electronically/remotely through Zoom as opposed to in-person.

The CDC on its official website provides statistical data concerning the COVID case rate per one hundred thousand citizens. When the initial guidance concerning the limitations of social interactions and the wearing of masks was initially issued the case rate was much lower than it is today. There has literally been an explosion of COVID-19 cases. On March 21, 2020 the case rate was 1.03 per one hundred thousand. On June 21, 2020, the case rate had increased to 8.15 per one hundred thousand. On August 21, 2020, the case rate had increased to 13.39 per one hundred thousand and as of November 21, 2020, the case rate has increased to 51.76 per one hundred thousand. This is a geometrically increasing rate of infection and as of November 30, 2020, there were 265,166 deaths from COVID-19. <u>See</u> printout from CDC website attached as Exhibit D.

### DOCUMENTED RISKS OF TRANSMISSION

The CDC, on their official website, also indicates that the virus spreads "through respiratory droplets when an infected person coughs, sneezes, breathes, sings or talks." The CDC further indicates that airborne transmission can occur when people are in enclosed spaces with poor ventilation and that "the more closely you interact with others, and the longer that interaction, the higher the risk of COVID-19 spread." <u>See</u> Exhibit E.

Since the national crisis that has resulted from COVID-19, and the subsequent measures enacted and/or recommended by such agencies as the CDC and the State of Florida, the undersigned has participated in numerous depositions taken by other defense counsel via Zoom and other video platforms. Not only has this not created an issue for any other Defendant, but it has been equally requested by opposing parties given the health threat posed by the pandemic.

## TEMPORAL AND PROXIMITY CONCERNS OF A DEPOSITION

Although defense counsel compares the deposition to an in-person court appearance there are some significant differences which raise the risk of potential infection by the virus substantially in a deposition setting.

Courtrooms typically contain a high ceiling and are well ventilated. In the courtroom, the presiding judge has control of the environment. The deposition of a plaintiff is typically very lengthy, often extending between four (4) and seven (7) hours in a low-ceilinged conference room. Defense counsel's desire to closely observe the plaintiff seems at odds with his assurances of social distancing. The extensive interaction between attorney and deponent constitutes a unnecessary personal and societal risk, given the geometric and pervasive nature of the virus spread.

## LACK OF SCIENTIFIC AUTHORITY SHOWING PREJUDICE

The allegations by defense counsel that he would be "substantially prejudiced" by a Zoom deposition are not supported by reference to any scientific, psychological, legal, or other citation of authority. Our justice system through Daubert and other safeguards is hesitant to consider unsubstantiated expert allegations generally and the speculative prejudice compared with the documented catastrophic risks engendered by sitting all day in an enclosed space with strangers outside your family unit whose interactions, medical condition, and precautionary activities are unknown and unverifiable is particularly striking. The equities of "substantial prejudice" apply not to the defense herein but rather with the plaintiffs who would be forced to take an unnecessary overnight trip prior to their depositions. Given that most (if not all) of plaintiff's counsel's depositions over the past six months have taken place via videoconferencing, there is no reason that these depositions cannot move forward in that

format as well. The zoom cameras can be utilized to accomplish very close up views of a

deponent to mitigate any perceived prejudice.

## EARLY COURT RULINGS PRIOR TO THE GEOMETRIC
## EXPLOSION OF COVID CASES

Courts around the country have embraced video depositions during the first months of

the pandemic as a safer, more prudent alternative to in-person depositions. *See, e.g.,*

- *Grano v. Sodexo Mgmt., Inc.,* 2020 WL 1975057, at *3 (S.D. Cal. Apr. 24, 2020) ("Sodexo argues that a protective order should issue because remote depositions are "unworkable" and will be "cumbersome". The Court rejects this argument. Attorneys and litigants all over the country are adapting to a new way of practicing law, including conducting depositions and deposition preparation remotely.");

- *KOS Bldg. Group, LLC v. R.S. Granoff Architects,* P.C., 2020 WL 1989487, at *6 n.5 (S.D. N.Y. Apr. 24, 2020) ("Despite the current requirement for social distancing, depositions may be completed by video-conferencing; a court reporter, able to swear the witness, is not required to be in the same location as the witness. The key preparation for such a remote deposition is to be certain that all documents to be utilized are pre-marked, and copies are present and available at the witness's location, the court reporter's location, and the location of each counsel in the case.");

- *SAPS, Llc. v. EZCare Clinic, Inc.,* 2020 WL 1923146, at *2 (E.D. La., Apr. 21, 2020) (The "court will not require parties to appear in person with one another in the midst of the present pandemic. Nor is it feasible to delay the depositions until some unknown time in the future" so long as that officer attends the deposition via the same remote means (e.g., video conference) used to connect all other remote participants, and so long as all participants (including the officer) can clearly hear and be heard by all other participants.");

- *Sinceno v. Riverside Church in City of New York,* 2020 WL 1302053, at *1 (S.D. N.Y., Mar. 18, 2020) (ordering that "all depositions in this action may be taken via telephone, videoconference, or other remote means, and may be recorded by any reliable audio or audiovisual means");

- *Velicer v. Falconhead Capital LLC,* 2020 WL 1847773, at *2 (W.D. Wash., Apr. 13, 2020) (concluding that the parties did not establish good cause for extending case deadlines "parties assert that the pandemic impacts their ability to take depositions in person, but they do not discuss why

they cannot conduct such depositions by telephone or other remote means" and urging the parties to consider alternatives to in person depositions); and

- *Conduent State Healthcare, Llc v. AIG Specialty Ins.* Co., 2020 WL 2301185, at *1 (Del. Super. Ct. May 8, 2020) ("The Court finds that remote depositions are not ideal. Nevertheless, there are many applications and devices which make video depositions not only feasible, but not out of the ordinary in these extreme and unusual circumstances requiring physical distancing in light of COVID-19. Additionally, the Court finds that taking depositions remotely in this case is not manifestly unfair and will not result in undue prejudice."

## CME AND/OR MEDICAL EVALUATIONS

The defendant complains that there is no reason not to take a live deposition, given that the plaintiff attended a compulsory medical evaluation in Gainesville and has also attended some medical appointments. The defendant is comparing apples to oranges in making this argument. From a temporal point of view, there is simply no comparison to a relatively brief doctor's visit and a lengthy, perhaps all day, deposition. Physicians have a duty not to harm any patient and to take all feasible medical precautions consistent with their expertise and training. Opposing counsel has no ethical, moral, or legal duty to concern himself with the well being of an adversarial party. The deposition is an extensive fact finding process conducted solely through questioning and response, sometimes in a heated or vigorous fashion, in an indoor setting, with no medical personnel or supervised precautions existent. The comparisons raised by the defendant between a doctors appointment and a vigorous, lengthy deposition are inapplicable given the present national emergency and health guidelines advised by the CDC, particularly for elderly plaintiffs who fall into a high risk category.

Given the nature of the injuries claimed by the plaintiffs, it is expected that the defendants may ask for additional compulsory medical evaluations. Plaintiff is not seeking an order at this time restricting all discovery to be conducted by remote means as some medical evaluations, such as the previously cited neurosurgical CME, may need to be in person. Unnecessary and risky interactions such as these depositions should be avoided.

## RESPONSE TO THIS COURT'S SPECIFIC QUESTIONS

In response to this Court's Order of November 25, 2020, Plaintiffs would verify that within the last ninety (90) days they have not attended other meetings, attended any public events or visited any public places with the exception of the following: the plaintiffs leave their house approximately once a week to shop for grocery essentials and if necessary to refuel their motor vehicle. They do not attend church, school or visit with friends. The defendant is correct that the plaintiffs have attended limited medical visits with physicians. These visits have been necessitated by the discovery schedule and have been of short duration and scope. No voluntary extraneous trips or visits have been undertaken by the plaintiffs except for life's necessities and the requirements to see physicians.

In response to this Court's inquiry as to whether the trial date should be continued, counsel is somewhat conflicted. The course of the pandemic as previously noted, is expanding but the emergency authorizations for vaccine approval are reportedly very promising. The situation is currently dire in terms of continuing infections and deaths, but at the same time there is great reason for optimism given the fabulous work of the medical community. It may well be appropriate to continue the case for a brief time or to revisit the issue of a continuance in thirty (30) days after the vaccine has begun to be distributed. If the pandemic appears to be resolving slowly rather than quickly, it would be more appropriate and safe to continue the

7

case so all participants including jurors, parties, and court personnel have lower risks of infection and mortality.

## CONCLUSION

The world is in the midst of a global pandemic but there is a potential end in sight. The minor accommodation sought in this case - to conduct the depositions by video conference- has been approved by federal and state courts around the country and is consistent with this Court's prior Administrative Orders. There is no undue demonstrable prejudice to any litigant by means of a video conference deposition and responsible social distancing through a video conference deposition is the safest course for all involved and consistent with published federal agency guidelines.

WHEREFORE the Plaintiffs respectfully request that the Defendant's Motion to Compel In-Person Deposition be denied and that an Order be entered pursuant to Rule 30(b)(4) allowing the plaintiffs' depositions by remote means, as originally noticed.

Respectfully submitted by electronic filing, this 2nd day of December, 2020.

Respectfully submitted,

**FINE, FARKASH & PARLAPIANO, P.A.**
622 Northeast First Street
Gainesville, Florida 32601
Telephone: 352-376-6046
Facsimile: 877-272-9101

BY: _____

**JACK J. FINE, ESQ.**
*Attorney for Plaintiff*
Florida Bar Number: 223700
Primary Email: jfine@ffplaw.com
Secondary Email: jduchaj@ffplaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on DECEMBER 2, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, via transmission of Notices of Electronic Filing generated by the CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

**FINE, FARKASH & PARLAPIANO, P.A.**

BY: _____

**JACK J. FINE, ESQUIRE**
*Attorney for Plaintiff*
Florida Bar Number: 223700

## **SERVICE LIST**

MARCELLE ANN ANGALL-LEONCE and ROMANUS SYLVESTER LEONCE vs.
ON POINT TRANSPORT, INC. AND JOSEPH MISATULI LEIA
Case No.: 1:20-cv-00127-AW-GRJ
United States District Court, Northern District of Florida

Jack J. Fine, Esquire
jfine@ffplaw.com
jduchaj@ffplaw.com
FINE, FARKASH & PARLAPIANO, P.A.
622 Northeast First Street
Gainesville, Florida 32601
*Attorneys for Plaintiff*

John Moffitt Howell, Esq.
pleadings@fernandeztl.com
jhowell@fernandeztl.com
Fernandez Trial Lawyers, PA
8780-200 Perimeter Park Court
Jacksonville, FL  32216
Attorney for Defendants

IN THE CIRCUIT COURT OF THE
EIGHTH JUDICIAL CIRCUIT IN AND
FOR ALACHUA COUNTY, FLORIDA

MARCELLE ANN ANGALL-LEONCE and
ROMANUS SYLVESTER LEONCE,

        CASE NO.:  19-CA-2558

        Plaintiffs,

vs.

ON POINT TRANSPORT, INC. and
JOSEPH MISATULI LEIA,

        Defendants.

_____/

## PLAINTIFF, MARCELLE ANN ANGALL-LEONCE'S, RESPONSE TO DEFENDANT'S FIRST REQUEST FOR PRODUCTION

COMES NOW the Plaintiff, **MARCELLE ANN ANGALL-LEONCE,** by and through undersigned counsel, pursuant to Fla. R. Civ. P. §1.350, and hereby files this Response to Defendant, ON POINT TRANSPORT, INC'S, First Request for Production to Plaintiff propounded by Defendant on April 1, 2020, and responds as follows:

1. Copies of any and all medical bills, doctor bills, hospital bills, medication bills, ambulance bills, physical therapy bills, and bills for other similar expenses incurred as a result of and related to the injuries which are the subject of this lawsuit.

        SEE ATTACHED MEDICAL BILLS

2. All claims forms or medical reports submitted on your behalf under medical payments, personal injury protection, health or disability provisions of any insurance policy as a result of the injuries described in the Complaint.

        SEE ATTACHED MEDICAL REPORTS

3. All hospital records for hospitalizations, which resulted from the incident described in the Complaint.

EXHIBIT
A

SEE ATTACHED HOSPITAL RECORDS

4.     All medical reports, opinions, or other written documents from doctors, nurses, other medical practitioners, or other expert witnesses, containing information concerning the injuries you sustained from the incident described in your Complaint.

SEE ATTACHED MEDICAL RECORDS

5.     Any photographs, videotapes, motion pictures, or drawings depicting any injuries you sustained in this incident, the scene of the incident, and any other matter relevant to this controversy.

SEE ATTACHED PHOTOGRAPHS

6.     Any and all police reports, incident reports, rescue reports, and any other reports related to the incident, which is the subject matter of this lawsuit.

SEE ATTACHED CRASH REPORT

7.     All documents which you contend support or document the amount of loss you have sustained from inability or diminished ability to earn a living as a result of the incident described in the Complaint.

SEE ATTACHED TAX RETURN AND DISABILITY DOCUMENTS

8.     All documents, which you contend support or document your loss of earnings.

SEE ATTACHED TAX RETURNS AND DISABILITY DOCUMENTS

9.     Income tax returns, W-2 Forms, and all schedules and attachments thereto for the years beginning five (5) years prior to the year of the incident which is the subject matter of this lawsuit, and up to and including calendar year 2019.

SEE ATTACHED TAX RETURNS

10. Copies of all written or transcribed statements made or given by any witness regarding this claim.

NONE

11. Copies of all written or transcribed statements made or given by Defendant or Defendant's employees or agents regarding this lawsuit.

NONE

12. Copies of all written or transcribed statements made or given by Plaintiff, ROMANUS SYLVESTER LEONCE, regarding this lawsuit.

SEE ATTACHED TRANSCRIBED STATEMENTS

13. Copies of all reports of experts, which express findings of facts or opinions regarding any of the issues relevant to this lawsuit.

NONE AT THIS TIME. EXPERTS SHALL BE DISCLOSED IN ACCORDANCE WITH THIS COURT'S TRIAL ORDER

14. A photograph depicting the current appearance of Plaintiff, MARCELLE ANN ANGALL-LEONCE.

SEE ATTACHED COPY OF DRIVERS LICENSE

15. All documents, settlement agreements, releases, etc. the support or document your answer to Interrogatory question #28.

NONE.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that this pleading has been efiled through the Florida Courts efiling portal to: John M. Howell, Esq., Ellis T. Fernandez, III, Esq., Fernandez Trial Lawyers, P.A., 8780-200 Perimeter Park Court, Jacksonville, FL 32216 at Pleadings@FernandezTL.com, Jhowell@FernandezTL.com; Klang-Thorbs@FernandezTL.com, on this 1ST day of May, 2020.

Respectfully submitted,

**FINE, FARKASH & PARLAPIANO, P.A.**
622 Northeast First Street
Gainesville, Florida 32601
Telephone: 352-376-6046
Facsimile: 877-272-9101

BY: _____

**JACK J. FINE, ESQ.**
*Attorney for Plaintiff*
Florida Bar Number: 223700
Primary Email: jfine@ffplaw.com
Secondary Email: jduchaj@ffplaw.com

# Marc Irwin Sharfman, M.D., P.A.

2137 West State Road 434, Longwood, FL 32779-4983
Phone 407-644-3737 • Fax 407-644-3009 • Email sharfman@headache-institute.com
www.headache-institute.com

## CNS Report

Patient: ANGALL-LEONCE,
MARCELLE          **MRN:** 145408     **DOB:** 05-Aug-1960   **Date: January 14, 2016**

## Neurocognitive Testing: Brain Function Integration into Final Report

- Testing Administrator: David
- Testing Date: 12/9/2015
- Interpreting Physician: Marc Sharfman M.D.
- Interpretation Date: 1/14/2016
- Time spent interpreting, preparing report, and reviewing with patient 35 minutes

## Reason For Visit

- **Reason for Visit:** July 26, 2015 motor vehicle accident followed by concentration difficulty, positive MR brain
- Based upon medical examination, patient expressed concerns and patient response to medical questionnaires a computerized battery of Neurocognitive tests was indicated and ordered.

## General Description of Neurocognitive Assessment:

- Neurocognitive testing is performed using a battery of seven tests that are designed to individually test the patient's verbal memory, visual memory, motor speed, psychomotor speed, reaction time, focus, ability to sustain attention and ability to adapt to changing rules and tasks. Raw scores are provided for each of these tests and are considered independently in the final assessment of this patients function.
- These raw scores are secondarily collated and scored by a sophisticated computer program into an overall global score, the NCI (neurocognitive index) and provides nine *domain scores* whose synthesis gives a better measure of the patient's actual mental function. These scores are age matched and reported as *typical percentiles* giving a more accurate picture of how the patient performed in relation to the general population and their age group.
- The data listed below can be reviewed in more detail in the completed report which is appended. Whenever possible the final impression will be influenced not only by the patient's scores but will be a summation of the historical, physical and clinical data gathered to that point.

## Outline of the Battery Test:

- Neuropsychological Testing was ordered to include Verbal Memory Test, Visual Memory Test, Finger Tapping Test, Symbol Digit Coding, Stroop Test, Shifting Attention Test and a Continuous Performance Test.

## Patient Profile in score report is attached to this interpretation report (Domain Scores described):

- **THE NEUROCOGNITION INDEX** is an average score derived from the other five domain scores.
- The patient scored in the 16th percentile which is low average.
- **THE COMPOSITE MEMORY** is a compound score to reflect how well the patient is able to remember words as well as geometric figures. Scores are presented in the three domains on the report. Composite Memory comes from the sum of the Verbal and Visual Memory scores. When a patient score is low or very low (<8th) scores these scores may be indicative of impairments seen in concussion, traumatic brain injury, dementia, mild cognitive impairment, but can be influenced by many factors including metabolism and medication effect. This score may be abnormally impaired in patients with slowed response times from CVA, extrapyramidal disease or other neurologic conditions.
- The patient scored in the 70th percentile which is average.
- **PSYCHOMOTOR SPEED**, which is a cumulative index of motor speed, coordination and visual perceptual ability based primarily on the Stroop Test which measures _____ ing speed, cognitive flexibility and ____

EXHIBIT
tabbies
B

MAY 1 1 2016

inhibition/disinhibition testing, the shifting attention test and the continuous performance test which measures sustained attention. Intoxication, medication effects, metabolic problems may be reflected in this score. Disorders which slow reaction time may also lower this index. Global cerebral dysfunction, such as concussion or mild traumatic brain injury, may impair this score significantly as can sleep disorders.

- The patient scored in the 9th percentile which is low average.
- **REACTION TIME** is basically a measure of how fast the patient can respond to complex direction. The Symbol Digit Coding Test (which is a timed psychomotor speed and visual-motor coordination test) and the Stroop Test (which measures processing speed, cognitive flexibility and inhibition/disinhibition shifts) predominate in this score's generation. Deficits in reaction time can impede tasks such as driving, tracking or responding to directions, occupational performance, attending to conversation and other issues. Reaction time deficits are presented in issues of concussion and traumatic brain injury and mild cognitive impairment.
- The patient scored in the 21st percentile which is low average.
- **COMPLEX ATTENTION** measures the individual's ability to maintain their focus and perform quickly and accurately. This domain score is primarily a combination of the Stroop test, the shifting Attention Test (which assesses the patient's ability to shift his responses to rapidly changing rules) and the Continuous Performance Test (which tests the patient's ability to sustain attention then react rapidly when clues appear). Score values can be significantly lowered by medication effects, metabolic dysfunction, attention deficit disorders, concussion, mild traumatic brain injury and dementia among other causes such as depression or anxiety. These scores can be affected by immediate recall memory problems. Life skills relevance applies to self-regulation, learning, productivity and behavioral control.
- The patient scored in the 9th percentile which is low average.
- **COGNITIVE FLEXIBILITY** reflects how well a subject is able to adapt to rapidly changing directions. It incorporates results from most of the individual tests administered but relies primarily on the Stroop Test, the Shifting Attentional test and the Continuous Performance Test. Relevance of these scores is reasoning, decision-making, impulse control and strategy formation.
- The patient scored in the 2nd percentile which is very low.
- **PROCESSING SPEED**, is a measure of how well a subject can automatically and fluently perform relatively easy or learned-over cognitive tasks especially when high mental efficiency is required such as maintaining attention and focused concentration. Scores are derived from the Symbol Digit Coding test measuring correct responses and number of errors. Deficits in processing speed can compromise patient's ability to respond/react to threats, take evasive action, see possible dangers/risk signs or indicate issues with accuracy and detail.
- The patient scored in the 30th percentile which is average.
- **EXECUTIVE FUNCTION** domain scores is reflection of patient results from the Shifting Attentional test. Measure indicates how a patient may recognize set shifting (mental flexibility) and abstraction (rules, categories) and manages multiple tasks simultaneously.
- The patient scored in the 2 nd percentile which is low.
- **SIMPLE ATTENTION** is derived from the Continuous Performance subtest where a subject's ability to track and respond to a single defined stimulus over lengthy periods of time while performing vigilance and response inhibition quickly and accurately is measured. Low scores may be indicative of impulsiveness and attention deficit. The relevance of simple attention testing helps give insight to a subjects self-regulation and simple attention control.
- The patient scored in the 68th percentile which is average.
- **MOTOR SPEED** domain score is comprised from the average number of left and right hand in the finger tapping test. Motor Speed is the ability of the subject to perform movements to produce and satisfy an intention towards a manual action and goal. This cognitive function is demonstrated in one's ability to manipulate and maneuver objects. The preparation and production of simple manual dexterity actions.
- The patient scored in the 10th percentile which is low average.
- **Validity:** All testing was valid
- **Differential Diagnosis:** Postconcussion syndrome
- **Plan:** Cognitive therapy

## Marc Sharfman MD

## Board-certified neurologist

MAY 1 1 2016

VASCULAR STRUCTURES: There is normal signal void within the major vessels of the circle of Willis. The superior sagittal sinus appears unremarkable on this examination.

DTI IMAGING: Diffusion tensor imaging was obtained as well. DTI is a much more sensitive and specific examination for the detection of postconcussive white matter lesions as it detects disruption within the white matter fibers. Evaluation of the DTI sequences demonstrates reduced fractional anisotropy seen in multiple regions within the subcortical white matter bilaterally. Many of these regions correspond to the lesions visualized no the FLAIR sequences further suggesting a posttraumatic etiology and clinical correlation may be helpful to confirm this.

NEUROQUANT IMAGING: The hippocampi are normal in size and contour bilaterally. The medial aspect of the temporal lobes are slightly increased in size bilaterally with associated borderline low/normal size of the adjacent lateral ventricles as a result. These findings are nonspecific and may represent hyperfunction in these regions. Clinical correlation may be helpful to confirm this.

SWI IMAGING: On SWI imaging, there is no evidence of hemorrhage or micro hemorrhage noted.

PERFUSION IMAGING: On perfusion imaging, there is no evidence of restricted diffusion or reduced perfusion to suggest acute infarct at this time.

IMPRESSION:

1. There are scattered bilateral foci of abnormal high T2 and FLAIR signal in the periventricular and subcortical white matter bilaterally. Given the patient's recent history of trauma, it is medically probable that many of these foci represent postconcussive white matter lesions and clinical correlation may be helpful to confirm this. See Figure 1, Image 21, Series 8 where the arrows are pointing towards some of the white matter lesions described.

2. Diffusion tensor imaging was obtained as well. DTI is a much more sensitive and specific examination for the detection of postconcussive white matter lesions as it detects disruption within the white matter fibers. Evaluation of the DTI sequences demonstrates reduced fractional anisotropy seen in multiple regions within the subcortical white matter bilaterally. Many of these regions correspond to the lesions visualized no the FLAIR sequences further suggesting a posttraumatic etiology and clinical correlation may be helpful to confirm this. See Figure 2, Image 47, Series 303 where the arrows are pointing towards the abnormalities.

3. On NeuroQuant imaging, the hippocampi are normal in size and contour bilaterally. The medial aspect of the temporal lobes are slightly increased in size bilaterally with associated borderline low/normal size of the adjacent lateral ventricles as a result. These findings are nonspecific and may represent hyperfunction in these regions. Clinical correlation may be helpful to confirm this.

4. On SWI imaging, there is no evidence of hemorrhage or micro hemorrhage noted.



| | | | |
|---|---|---|---|
| **Patient Name:** | Angall-Leonce, Marcelle | **Accession Number:** | 9593814 |
| **Patient ID:** | 2266671 | **Location:** | SimonMed Florida Winter Park |
| **Gender:** | Female | **Exam Date:** | December 15, 2015 08:24 |
| **Date of Birth:** | August 5, 1960 | **Modality:** | MR |
| **Referring Physician:** | Sharfman, Marc Irwin | **Report Status:** | Final |

## BRAIN W & W/O CONTRAST

HISTORY: Headaches status post motor vehicle accident dated 07/26/2015.

TECHNIQUE: Multisequence T1-weighted and T2-weighted images were obtained with and without contrast. 10 mL of OptiMARK were administered.

FINDINGS: SUPRATENTORIAL STRUCTURES: The cerebral hemispheres appear normal. There is no evidence for a mass, fluid collection or hemorrhage. There are scattered bilateral foci of abnormal high T2 and FLAIR signal in the periventricular and subcortical white matter bilaterally. Given the patient's recent history of trauma, it is medically probable that many of these foci represent postconcussive white matter lesions and clinical correlation may be helpful to confirm this. The basal ganglia are within normal limits.

POSTERIOR FOSSA: The brainstem is normal in signal intensity. The cerebellum appears within normal limits. The cerebellar folia and sulci are unremarkable. cerebellopontine angle mass.

INTERNAL AUDITORY CANALS: Evaluation of the internal auditory canals demonstrates no abnormalities. No masses, lesions, or regions of abnormal enhancement are seen. The 7th/8th nerve complexes are intact bilaterally. In addition, the visualized portions of the 5h and 6th cranial nerves appear normal and undisturbed bilaterally.

VENTRICULAR SYSTEM: The ventricles are normal in size and shape. There is no evidence for hydrocephalus and there is no evidence for transependymal flow of CSF.

SKULL BASE AND OSSEOUS STRUCTURES: There is mucosal thickening seen in the maxillary sinuses with fluid in the ethmoid sinuses bilaterally and mucosal thickening in the frontal sinuses bilaterally suggestive of sinus disease. The orbits and temporal bones are within normal limits. The sella structures appear within normal limits. There is no evidence for abnormal mass or fluid collection associated with these structures.

VASCULAR STRUCTURES: There is normal signal void within the major vessels of the circle of Willis. The superior sagittal sinus appears unremarkable on this examination.

DTI IMAGING: Diffusion tensor imaging was obtained as well. DTI is a much more sensitive and specific examination for the detection of postconcussive white matter lesions as it detects disruption within the white matter fibers. Evaluation of the DTI sequences demonstrates reduced fractional anisotropy seen in multiple regions within the subcortical white matter bilaterally. Many of these regions correspond to the lesions visualized no the FLAIR sequences further suggesting a posttraumatic etiology and clinical correlation may be helpful to confirm this.


| | | | |
|---|---|---|---|
| **Patient Name:** | Angall-Leonce, Marcelle | **Accession Number:** | 9593814 |
| **Patient ID:** | 2266671 | **Location:** | SimonMed Florida Winter Park |
| **Gender:** | Female | **Exam Date:** | December 15, 2015 08:24 |
| **Date of Birth:** | August 5, 1960 | **Modality:** | MR |
| **Referring Physician:** | Sharfman, Marc Irwin | **Report Status:** | Final |

NEUROQUANT IMAGING: The hippocampi are normal in size and contour bilaterally. The medial aspect of the temporal lobes are slightly increased in size bilaterally with associated borderline low/normal size of the adjacent lateral ventricles as a result. These findings are nonspecific and may represent hyperfunction in these regions. Clinical correlation may be helpful to confirm this.

SWI IMAGING: On SWI imaging, there is no evidence of hemorrhage or micro hemorrhage noted.

PERFUSION IMAGING: On perfusion imaging, there is no evidence of restricted diffusion or reduced perfusion to suggest acute infarct at this time.

IMPRESSION:

1. There are scattered bilateral foci of abnormal high T2 and FLAIR signal in the periventricular and subcortical white matter bilaterally. Given the patient's recent history of trauma, it is medically probable that many of these foci represent postconcussive white matter lesions and clinical correlation may be helpful to confirm this. See Figure 1, Image 21, Series 8 where the arrows are pointing towards some of the white matter lesions described.

2. Diffusion tensor imaging was obtained as well. DTI is a much more sensitive and specific examination for the detection of postconcussive white matter lesions as it detects disruption within the white matter fibers. Evaluation of the DTI sequences demonstrates reduced fractional anisotropy seen in multiple regions within the subcortical white matter bilaterally. Many of these regions correspond to the lesions visualized no the FLAIR sequences further suggesting a posttraumatic etiology and clinical correlation may be helpful to confirm this. See Figure 2, Image 47, Series 303 where the arrows are pointing towards the abnormalities.

3. On NeuroQuant imaging, the hippocampi are normal in size and contour bilaterally. The medial aspect of the temporal lobes are slightly increased in size bilaterally with associated borderline low/normal size of the adjacent lateral ventricles as a result. These findings are nonspecific and may represent hyperfunction in these regions. Clinical correlation may be helpful to confirm this.

4. On SWI imaging, there is no evidence of hemorrhage or micro hemorrhage noted.

5. On perfusion imaging, there is no evidence of restricted diffusion or reduced perfusion to suggest acute infarct at this time.

6. There is mucosal thickening seen in the maxillary sinuses with fluid in the ethmoid sinuses bilaterally and mucosal thickening in the frontal sinuses bilaterally suggestive of sinus disease.

7. Evaluation of the internal auditory canals demonstrates no abnormalities. No masses, lesions, or regions of abnormal enhancement are seen. The 7th/8th nerve complexes are intact bilaterally. In addition, the visualized portions of



| Patient Name: | Angall-Leonce, Marcelle | Accession Number: | 9593814 |
|---|---|---|---|
| Patient ID: | 2266671 | Location: | SimonMed Florida Winter Park |
| Gender: | Female | Exam Date: | December 15, 2015 08:24 |
| Date of Birth: | August 5, 1960 | Modality: | MR |
| Referring Physician: | Sharfman, Marc Irwin | Report Status: | Final |

the 5h and 6th cranial nerves appear normal and undisturbed bilaterally.
Reported by: Andrew Akerman M.D.
Electronically signed by: Andrew Akerman M.D. on Dec 17, 2015 @ 10:12




| | | | |
|---|---|---|---|
| **Patient Name:** | Angall-Leonce, Marcelle | **Accession Number:** | 9593814 |
| **Patient ID:** | 2266671 | **Location:** | SimonMed Florida Winter Park |
| **Gender:** | Female | **Exam Date:** | December 15, 2015 08:24 |
| **Date of Birth:** | August 5, 1960 | **Modality:** | MR |
| **Referring Physician:** Sharfman, Marc Irwin | | **Report Status:** | Final |





SimonMed™
*See Tomorrow Today*

| | | | |
|---|---|---|---|
| **Patient Name:** | Angall-Leonce, Marcelle | **Accession Number:** | 9593619 |
| **Patient ID:** | 2266671 | **Location:** | SimonMed Florida Winter Park |
| **Gender:** | Female | **Exam Date:** | December 15, 2015 08:24 |
| **Date of Birth:** | August 5, 1960 | **Modality:** | MR |
| **Referring Physician:** | Sharfman, Marc Irwin | **Report Status:** | Final |

## HEAD MRA W/O CONTRAST W 3D RECON

HISTORY: Headaches status post motor vehicle accident dated 07/26/2015.

TECHNIQUE: MRA of the circle of Willis was performed and 3D reconstructions were obtained.

FINDINGS: In the posterior circulation, the vertebrobasilar and posterior cerebral arteries are unremarkable. In the anterior circulation, the internal carotid, anterior cerebral and middle cerebral arteries are unremarkable. There is no evidence for aneurysm or significant stenosis within the circle of Willis.

IMPRESSION:

1. Unremarkable MRA of the circle of Willis.

Reported by: Andrew Akerman M.D.
Electronically signed by: Andrew Akerman M.D. on Dec 17, 2015 @ 10:12

PSYCHOLOGICAL & NEUROBEHAVIORAL ASSOCIATES, INC.
Clinical and Neuropsychological Assessment

## NEUROPSYCHOLOGICAL EVALUATION

**NAME:**            **ANGALL-LEONCE, MARCELLE**
**DOB:**             **08/05/1960**
**AGE:**             **55 YEARS OLD**
**DATE:**            **07/08/2016**
**CLAIM NUMBER:**    **10074419-02**

### REASON FOR REFERRAL

Mrs. Angall-Leonce is a 55-year-old female, referred for a Neuropsychological Evaluation to assess current emotional and cognitive functioning at the request of MES Solutions. The limits of confidentiality were discussed with her and her husband as not doctor-patient relationship exists.

### BACKGROUND INFORMATION

The following should be interpreted with caution and is subject to distortion. This information is a client self-reported perspective on her own personal history. It is, therefore, limited in extent, highly subjective, and may possibly contain errors of interpretation or omission. It should not be viewed as definitive or as a factual account.

Past medical history indicates that she was riding a bicycle and fell 20 years ago and sustained a head injury. She was not wearing a helmet. She did not lose consciousness. There is no history of strokes. She now takes Motrin 800 mg. Her sleep is good. Her appetite is poor. She lost an unknown amount of weight.

Psychosocial history indicates Mrs. Angall-Leonce was born and raised in Guyana. She completed high school in Guyana and then moved to Jamaica (1979 to 1988). She eventually moved to Saint Lucia for several months and then immigrated to the United States in 1990. She now lives with her husband, two daughters and son-in-law. She has been married for 28 years. She has a positive peer network. She graduated in 1984. She has a Bachelor's degree in Science and Nursing in 1988 from the Northern Caribbean University. She has held previous employment as a nurse. She has been on disability since her motor vehicle accident in July 2015. She has not worked since the accident. Substance abuse history was denied. She denied alcohol intake. Criminal history was denied. She does not receive SSI benefits. Psychiatric history was denied, specifically prior to the accident. Family psychiatric history was denied.

All medical records were requested and the following were available for review.

There is a disability questionnaire and activities of daily living dated May 20, 2016.

Physical Ability Assessment note dated June 11, 2016, as completed by Dr. Sharfman.

Neurosurgical followup note dated July 26, 2015, by Dr. Rodas.

*P.O. Box 278455, Miramar, Florida 33027 • Office: (305) 823-1808 • Fax: (954) 704-0320*

**NAME: ANGALL-LEONCE, MARCELLE**
**PAGE 2**

Follow-up note from Dr. Sharfman dated May 19, 2016. The impression was acute posttraumatic headache, intractable; injury of lumbosacral plexus, subsequent encounter; injury of nerve root of cervical spine, subsequent encounter; injury of trigeminal nerve, left side, subsequent encounter; post-concussion syndrome, traumatic rupture of cervical intervertebral disc, subsequent encounter; vertigo of central origin, bilateral.

Note from Dr. Sharfman dated April 13, 2016. The impression was acute posttraumatic headache, intractable; injury of lumbosacral plexus, subsequent encounter; injury of nerve root of cervical spine, subsequent encounter; injury of trigeminal nerve, left side, subsequent encounter; post-concussion syndrome, traumatic rupture of cervical intervertebral disc, subsequent encounter; vertigo of central origin, bilateral.

A note from Dr. Sharfman dated March 17, 2016. Similar aforementioned diagnoses.

Disability management solution medical request form Dr. Ostheim, D.C., dated November 11, 2015, indicating that she is not able to drive.

Fraud warning note dated February 5, 2016.

Disability management solution medical request form completed by Dr. Sharfman dated January 3, 2016.

Note from Dr. Koch dated August 4, 2015. The impression was neck and back pain following motor vehicle accident.

Daily note dated February 22, 2015, by Dr. Ostheim, December 3, 2015, December 22, 2015, November 19, 2015, November 2, 2015, November 9, 2015, November 11, 2015, November 5, 2015, October 26, 2015, October 23, 2015, November 30, 2015, October 2, 2015, October 16, 2015, November 3, 2015, October 8, 2015, October 12, 2015, November 4, 2015, August 28, 2015, August 26, 2015, August 24, 2015, August 21, 2015, August 18, 2015.

Final evaluation dated December 7, 2015 from unspecified physician that is incomplete.

Initial evaluation dated August 17, 2015 revealing a diagnosis of cervical radiculitis, lumbar radiculitis, thoracic sprain/strain, cervical sprain/strain, lumbar sprain/strain, restriction of motion, spasm of the muscle as completed by Dr. Ostheim.

To continue with Dr. Ostheim's note
There is an MRI of the lumbar spine without contrast dated August 20, 2015, revealing impression of:
1. Thoracolumbar dextroscoliosis, L4-L5 level, grade 1 anterolisthesis of L4 on L5.
2. Diffuse circumferential disc bulge, flattening of the anterior thecal sac. Anterior disc bulge, displaces the prevertebral soft tissues.
3. L5-S1 level: Disc bulge effaces ventral epidural fat indenting the anterior thecal sac. Anterior disc bulge displaces the prevertebral soft tissues.

NAME: ANGALL-LEONCE, MARCELLE
PAGE 3

4. There appeared to be multiple uterine fibroids. Consider further evaluation with pelvic ultrasound or MRI.

MRI of the cervical spine without contrast dated August 20, 2015, reveals impression:
1. Reversal of the upper cervical lordosis.
2. C2-C3 level broad-based posterior central disc herniation indenting and compressing the anterior thecal sac. Neural foramen is patent.
3. C3-C4 level: Diffuse circumferential disc bulge with broad-based large parasagittal disc herniation indenting and compressing the anterior thecal sac. Herniation extends across the disc space 1.1 cm in sagittal image No. 7/12. Neural foramen is patent.
4. C4-C5 level: Broad based large posterior central disc herniation with annular tear indenting and compressing the anterior thecal sac producing moderate central stenosis. Neural foramen is patent.
5. C5-C6 level: Diffuse circumferential disc bulge indenting and compressing the anterior thecal sac producing mild central stenosis. Neural foramen is patent.
6. C6-C7 level: Diffuse circumferential disc bulge indenting and compressing the anterior thecal sac without significant stenosis. Neural foramen is patent.
7. C7-T1 level: Broad-based disc bulge indenting and compressing the anterior thecal sac without significant stenosis. Neural foramen is patent.

Notes of Dr. Ostheim dated September 30, 2015, October 1, 2015, September 29, 2015, September 24, 2015, September 28, 2015, September 23, 2015, September 21, 2015, September 4, 2015, September 18, 2015, September 2, 2015, September 22, 2015, September 15, 2015, September 11, 2015, October 5, 2015, September 10, 2015, October 6, 2015, October 1, 2015, September 29, 2015, September 24, 2015, September 28, 2015, September 23, 2015, September 4, 2015, September 18, 2015, September 2, 2015, September 22, 2015, September 11, 2015, September 10, 2015. Date of service December 7, 2015.

MRI of the brain without contrast dated October 18, 2015 that was unremarkable.

CT of the brain without contrast dated October 9, 2015, reveals no CT evidence of acute intracranial process; specific, no mass/mass effect, hemorrhage, or acute infarction by CT.

CT of the cervical spine without contrast dated October 9, 2015, reveals negative for acute fracture, significant listhesis. Negative for significant central canal stenosis. Degenerative disc changes most prominent at C3-C4.

There is a note from Dr. Sharfman dated December 7, 2015. The diagnosis was acute posttraumatic headache, intractable; post-concussion syndrome; injury of lumbosacral plexus, initial encounter; vertigo of central origin, bilateral; traumatic rupture of cervical intervertebral disc, initial encounter; sprain of ligaments of lumbar spine, initial encounter; injury of trigeminal nerve, left side, initial encounter; sprain of ligaments of cervical spine, initial encounter; injury of nerve root of cervical spine, initial encounter; injury of facial nerve, left side, initial encounter.

Notes from Dr. Sharfman dated December 12, 2015.

NAME: ANGALL-LEONCE, MARCELLE
PAGE 4

Medical records from Shands University Hospital, date of admission was July 26, 2015, discharge was July 27, 2015. Records indicate complaints of pain, no LOC, no head trauma/injury. She was alert and oriented to person and place, normal mood and affect. Her behavior was normal.

Notes from Dr. Loren dated July 26, 2015, under Neurological Assessment. She was responding readily to a normal speaking voice. The patient is awake and alert. No neurological deficits noted. Equal grip strength. Moving all extremities. Speech is clear and the patient answered all questions appropriately.

Note from Dr. Sharfman dated January 14, 2016, April 13, 2016. There is a CNS report from Dr. Sharfman dated January 14, 2016. Her Neurocognition Index was in the low average range. Her Composite Memory was in the average range. Psychomotor Speed was low average. Reaction Time was low average. Complex Attention was low average. Cognitive Flexibility was low average. Processing Speed was average. Executive Function was low. Simple Attention was average. Motor Speed was low average. Testing was considered to be valid. Differential diagnosis was post-concussion syndrome. The plan was for cognitive therapy.

There are hand-written notes dated April 15, 2016, which are difficult to decipher. Hand-written note from Dr. Sharfman dated January 21, 2016, January 19, 2016, January 7, 2016, January 5, 2016, and December 29, 2015.

A medical review dated April 12, 2016 by Dr. Vatt. Videonystagmography dated December 21, 2015, revealed no evidence of significant peripheral vestibular dysfunction. There is evidence of significant central vestibular dysfunction. Delayed saccades denoted lesion of the frontal or frontal parietal cortex of basal ganglia. These must be interpreted with caution; and consider medication and attention. Asymmetric or reduced optokinetic nystagmus in the context of either abnormal pursuits or saccades denotes a central vestibular lesion. VOR asymmetry suggests central dysfunction ipsilateral to the direction of asymmetry. Low vision must be considered.
.There is an EMG study from Dr. Sharfman's office dated December 17, 2015, reveals right
There is an EMG study from Dr. Sharfman's office dated December 17, 2015, reveals right peroneal motor nerve showed reduced amplitude at the ankle. The diagnosis was right peroneal motor neuropathy.

MRI with DTI without contrast dated December 15, 2015. The impression was:
1. There are scattered bilateral fossae of abnormal high T2 and flair signal in the periventricular and subcortical white matter bilaterally. Given the patient's recent history of trauma, it is medically probable that many of these fossae represent post-concussion white matter lesions, and clinical correlation may be helpful to confirm this. See figure 1, image 21, series 8, where the arrows are pointing towards some of the white matter lesions described.
2. Diffusion tensor imaging was obtained as well. DTI is a much more sensitive and specific examination of the detection of post-concussion white matter lesions as it detects disruption within the white matter fibers. Evaluation of the DTI sequences demonstrates reduced fractional anisotropy seen in multiple lesions within the subcortical white matter bilaterally. Many of these

NAME: ANGALL-LEONCE, MARCELLE
PAGE 5

lesions corresponds to the lesions visualized no FLAIR sequences further suggesting a post-traumatic etiology and clinical correlation may be helpful to confirm this. See figure 2, image 47, series 303 where the arrows are pointing towards the abnormalities.

3. On NeuroQuant imaging, the hippocampi are normal in size and contour bilaterally. The medial aspects of the temporal lobes are slightly increased in size bilaterally with associated borderline low/normal size of the adjacent lateral ventricle as a result. These findings are nonspecific and may represent hyper-function in these regions. Clinical correlation may be helpful to confirm this.

4. On the SWI imaging, there is no evidence of hemorrhage or microhemorrhage noted.

5. On perfusion imaging, there is no evidence of restricted diffusion or reduced perfusion to suggest acute infarct at this time.

6. There is mucosal thickening seen in the maxillary sinuses with fluid in the ethmoid sinuses bilaterally and mucosal thickening in the frontal sinuses bilaterally suggestive of sinus disease.

7. Evaluation of the internal auditory canals demonstrates no abnormalities. No masses, lesions, or regions of abnormal enhancement are seen. The VII/VIII nerve complexes are intact bilaterally. In addition, the visualized portions on the VH and VI cranial nerves appear normal and undisturbed bilaterally.

There is an MRA without contrast with 3D performed on December 15, 2015, that was unremarkable for the circle of Willis.

There is an ultrasound duplex scan of carotid bilateral dated December 15, 2015. The impression was:

1. There is no ultrasound evidence of significant stenosis within the bilateral cervical carotid arterial system. These findings are supported by duplex Doppler ultrasound velocity findings.

2. There is no evidence of carotid dissection in either circulation.

There is an EEG performed on December 12, 2015 that was normal.

Hand-written note from Dr. Sharfman's office dated December 17, 2015, December 15, 2015, December 9, 2015.

Progress note dated November 12, 2015 by Dr. Carr's office. The assessment was encounter for preventive health exam, obesity, never a smoker. Notes from Dr. Carr's office dated September 4, 2015.

Neurosurgical followup visit dated July 26, 2015, recommending a neurological evaluation.

Operative report dated November 12, 2015. The procedure was cervical epidural steroid injection, fluoroscopy for guidance.

Neurosurgical followup note dated July 26, 2015, by Dr. Rodas.

NAME: ANGALL-LEONCE, MARCELLE
PAGE 6

## HISTORY OF PRESENTING SUBJECTIVE COMPLAINTS

On July 26, 2015, Mrs. Angall-Leonce was a front seat passenger who was clipped by an 18-wheeler tractor trailer. Apparently, she pulled over and within five minutes, she began to feel a tingling sensation to her neck. Rescue arrived and treated her at the scene. She was taken to UF Shands Hospital via ambulance. She was told that she had a muscle strain. She was told she would get better in a few days, but eventually she got worse. She was then referred to Dr. Tendolkar where X-rays were apparently negative. She saw a second doctor (unknown), who referred her for physical therapy. At that time, she was describing constant neck pain, "I could not get out of bed." Mrs. Angall-Leonce never sustained a head injury in the accident, but believes that she had a whiplash effect.

Mrs. Angall-Leonce eventually began chiropractic treatment in West Orange. She had an MRI, which revealed a cervical ruptured disc. She was then referred to Dr. Rodas, neurosurgeon who did an epidural block. She was referred to an orthopedic surgeon for a second opinion. Dr. Rodas recommended surgery, but she was very hesitant and refused. She began to receive cervical traction for four days a week for four weeks. She was given restrictions, as she was unable to lift past five pounds. She had a brain MRI, which was eventually negative. She states that the epidural made her pain worse and increased her blood pressure. Eventually, she was referred to Dr. Sharfman, neurologist in December 2015. She had a MRI, which revealed trigeminal nerve involvement and a postconcussion syndrome. On or about that time, she had developed concentration difficulties and was slow to process information. She was seen by Dr. White for six sessions for cognitive therapy.

Present physical complaints include cervical pain. She has limited lifting with a maximum of three pounds. She has poor balance and headaches. Emotionally, "sometimes, it is hard." She has occasional depression, but "I do not have clinical depression. It is situational and normal." When asked to describe her cognitive changes, she notes "it is tough." She needs to re-read information over and over again. She has begun studying to be a nurse practitioner, but has had extreme difficulties learning the information. Her GPA tends to fluctuate from As to B+. This term, she had 78 in one of her classes and 91 in her online classes.

I was able to interview her husband. He stated that she is forgetful and needs constant reminders. At this time, she is not receiving any current therapy and was seen by Dr. Sharfman last month. She has a follow-up visit next month.

NAME: ANGALL-LEONCE, MARCELLE

PAGE 7

## BEHAVIORAL OBSERVATIONS/MENTAL STATUS EXAMINATION

Mrs. Angall-Leonce is a 55-year-old right-handed female who was cooperative, motivated, and understood the reason for the evaluation. She arrived accompanied with her husband who drove her to the session. He did wait for her in the waiting room. At the time of the evaluation, her thought processes appeared logical and coherent. She denied any visual, tactile, olfactory, or auditory hallucinations. She also denied any suicidal/homicidal ideation, plan, or intent. She was alert and oriented x3. Fine motor control for paper/pencil task was within expectancy. Overall, she did put forth good effort and motivation, therefore these findings are considered to be a valid representation of her present level of functioning. She was given multiple breaks in order to avoid fatigue.

## EVALUATION PROCEDURES

Neurobehavioral Clinical Interview
Hopkins Verbal Learning Test – Revised
Rey 15-Item test
The Dot Counting test (DCT)
Color Trails 1 and 2
Beck Depression Inventory – II (BDI – II)
Beck Anxiety Inventory (BAI)
Wechsler Adult Intelligence Scale – Fourth Edition
Minnesota Multiphasic Personality Inventory – 2 (MMPI-2)
Test of General Reasoning Ability for Adults (TOGRA)
Rey-Osterrieth Complex Figure
Test of Memory Malingering (TOMM)

## INTERPRETATION OF TEST RESULTS

## INTELLECTUAL-WAIS-IV

| VERBAL COMPREHENSION | SS | PERCEPTUAL REASONING | SS |
|---|---|---|---|
| Similarities | 8 | Block Design | 7 |
| Vocabulary | 10 | Matrix Reasoning | 11 |
| Information | 10 | Visual Puzzles | 6 |

| WORKING MEMORY | SS | PROCESSING SPEED | SS |
|---|---|---|---|
| Digit Span | 8 | Symbol Search | 10 |
| Arithmetic | 8 | Coding | 10 |

Mrs. Angall-Leonce obtained a Verbal Comprehension Index of 96 (39th percentile, Average range), a Perceptual Reasoning Index of 88 (21st percentile, Low Average range), a Working Memory Index of 89 (23rd percentile, Low Average range), a Processing Speed Index of 100 (50th percentile, Average range), and a Full Scale IQ of 92 (30th percentile, Average range), which indicates that she is currently performing within the estimated Average range of intellectual functioning. These findings are considered to be a slight decrease from estimated

NAME: ANGALL-LEONCE, MARCELLE

PAGE 8

premorbid levels of functioning.

## ATTENTION AND MEMORY

Immediate auditory attention was low average (SS = 8), as she recited six numbers forward and five numbers backwards. New verbal learning was average as she recalled a maximum of 25/36 words after three learning trials. After a 20 to 25 minute delay, she recalled 9/12 words (average range). Immediate incidental nonverbal memory was high average. Delayed nonverbal memory recall was superior.

## EFFORT/SYMPTOM/PERFORMANCE VALIDITY

Mrs. Angall-Leonce was administered both standalone and embedded measures to assess for effort and malingering. On the Rey 15-item test, a measure used to assess for attempts at simulation and malingering, her performance was within expectancy (Rey = 15/15). She did have good effort as per the DCT (E-score = 7). She also had good effort as per the Reliable Digit Span (RDS = 7). On the TOMM, a measure used to assess for attempts at feigning cognitive impairment and malingering, her performance was within expectancy (Trials I = 48 and Trials II = 49).

## LANGUAGE SUBSKILLS

On spontaneous conversation, there was no evidence of expressive or receptive difficulties, neologisms or paraphasias. Fund of information was average (SS = 10). Mental arithmetic was formally scored in the low average range (SS = 8). Expressive vocabulary was also average (SS = 10).

## VISUOSPATIAL/CONSTRUCTIVE SUBSKILLS

Constructional praxis was within expectancy for age and education (Rey/O = 36/36). Visuoconstructive assembly of blocks was low average (SS = 7). Ability to analyze and synthesize abstract visual stimuli was also borderline (SS= 6). Rapid coding of symbols and digits was average (SS = 10).

## EXECUTIVE SKILLS

Conceptual reasoning defined by the ability to ascribe common attributes between objects was low average (SS = 8). Nonverbal abstract reasoning was average (SS = 11). Visual psychomotor speed and rapid scanning was low average (Trails 1 = 51 seconds). Color number set shifting or divided attention was severely impaired (Trails 2 = 137 seconds).

The TOGRA is a speeded measure of reasoning ability and problem solving skills. The TOGRA consists of items to assess verbal, nonverbal, and cognitive reasoning, and problem solving skills through tests that are inductive as well as deductive in nature. On this measure her performance was low average (SS-87).

## PSYCHOLOGICAL FUNCTIONS

Brief screening with the BDI-II revealed that she endorsed minimal symptoms of depression (BDI - II Score = 11). She endorsed severe symptoms of anxiety (BAI Score = 35).

NAME: ANGALL-LEONCE, MARCELLE
PAGE 9

The results of the MMPI –2 indicate a tendency to be unrealistically virtuous. This test-taking attitude weakens the validity of the test and shows an unwillingness or inability on her part to disclose personal information. Reasons for this response set includes a pattern of uncooperativeness or conscious distortion to present herself in a favorable light. Her MMPI-2 clinical profile suggests that she is reporting a number of vague physical complaints. She has a tendency to develop physical problems when she is under stress.

## SUMMARY/IMPRESSIONS

Mrs. Angall-Leonce is a 55-year-old right-handed female referred for a Neuropsychological Evaluation to assess emotional and cognitive functioning after having been involved in a motor vehicle accident.

Results of formal intellectual testing indicate that she is now performing within the estimated average range (VCI = 96, PRI = 88, WMI = 89, PSI = 100, FSIQ = 92). Verbal learning was average. Immediate and delayed nonverbal memory were high average to superior. There were no indications of malingering. Good effort was sustained throughout the entire session. In sum, these findings are consistent with a resolving postconcussion syndrome. There are select cognitive weakness in executive functions. A good prognosis and recovery is expected.

## DIAGNOSTIC IMPRESSION (DSM - 5)
Mild Neurocognitive Disorder secondary to Traumatic Brain Injury

## QUESTIONS:

1. Is the individual mentally, cognitively and/or behaviorally impaired, (if so, explain these impairments?); if the individual is impaired, are work activity restrictions medically required - if so, what are these and explain why they are necessary and what is your estimate of the duration?

Mrs. Angall-Leonce presents with cognitive impairment specifically with deficits in executive capabilities, limited attention and concentration and abstract reasoning deficits. There are no behavioral impairments. She does report emotional difficulties, specifically with anxiety. Given that she is a clinical nurse and is involved in direct patient care, I do not recommend that she continue direct patient care at this time. Any clinical work should be supervised. Estimated duration would be 2-4 months or upon a re-evaluation.

2. Areas of functionality of particular interest which we would like your opinion that include all
2. Areas of functionality of particular interest which we would like your opinion that include all the following, please address each individually.

Directing, controlling, planning and sustaining activities.
- Able to accept responsibility for control, direction, or planning on activities.

    No deficits in this area.

Performing repetitive work.
- Able to perform repetitive or continuous activity according to set procedures.

NAME: ANGALL-LEONCE, MARCELLE
PAGE 10

No deficits in this area.

Influencing people.
- Able to influencing people and their opinions, attitudes or judgments about ideas or things.

No deficits in this area.

Perform a variety of duties.
- Able to perform a variety of duties often from one task to another without loss of efficiency or composure.

This area would be impacted by attentional difficulties and shifting sets.

Expressing personal feelings.
- Able to interpret feelings, ideas or facts in terms of personal viewpoint.

No impairment in this area.

Working alone or in isolation.
- Able to be without face-to-face contact for extended periods of time.

As mentioned, I do not recommend that she be allowed to have direct patient contact. She should not be left alone treating patients.

Performing under stress.
- Able to perform under stress when confronted with emergencies or unusual situations.

This area appears to be slightly impacted by her ability to shift sets.

Attaining precise limits/tolerance.
- Able to perform with demands of precise attainments of set limits, tolerance or standards.

The only deficit in this area would be ability to meet timed activities.

Follow specific instructions
- Able to perform without room for independent actions or judgments.

No deficits in this area.

Dealing with people.
- Able to deal with people beyond giving and receiving instructions such as working as a member of a team or committee.

NAME: ANGALL-LEONCE, MARCELLE
PAGE 11

No deficits in this area.

Making judgment and decisions.
- Able to make generalizations, judgments, or decisions based on subjective or objective criteria such as with the five senses or factual data.

No deficits in this area.

Alejandro J. Arias, Psy. D.
Licensed Psychologist
PY6085
Clinical and Neuropsychology

AJA/ZyDocZyDoc.com/6665479/sd

## Janice Duchaj

| | |
|---|---|
| **From:** | Janice Duchaj |
| **Sent:** | Wednesday, May 6, 2020 10:02 AM |
| **To:** | Kathi Lang-Thorbs; AngallLeonce.Marcelle1@projects.filevine.com |
| **Cc:** | John Howell; Melissa Hunter; Ben Swart; Tressie Tanner; Catherine Arpen; Sabrina Cuddihee; Kimberly Killins |
| **Subject:** | RE: LEONCE, ROMANUS S VS CJ HESTER INC. - DOCUMENTS IN RESPONSE TO DISCOVERY REQUESTS and ANSWERS TO ROGGS |
| **Attachments:** | MARCELLE ANSWERS TO INTERROGATORIES (Marcelle Leonce).pdf; ROMANUS ANSWERS TO INTERROGATORIES.pdf; PLAINTIFF ROMANUS RESPONSE TO FIRST REQUEST FOR PRODUCTION.pdf; PLAINTIFF MARCELLE RESPONSE TO FIRST REQUEST FOR PRODUCTION.pdf; PLAINTIFF MARCELLE NOTICE OF SERVICE OF ANSWERS TO FIRST SET OF INTERROGATORIES.pdf; PLAINTIFF ROMANUS NOTICE OF SERVICE OF ANSWERS TO FIRST SET OF INTERROGATORIES.pdf |

Good Morning Kathi: Hope all is well. Attached please find plaintiff's answers to interrogatories and response to request for production documents; the emails sent to you on Friday got kicked back on my end because the files were too big. Therefore, see attached drop box link below containing all the discovery documents just to make sure you received them all. Thanks, Janice

https://www.dropbox.com/sh/ta9o4x1vjhqexkg/AABSlD5hn0zVhCnF_eoJOA8za?dl=0

---

**From:** Kathi Lang-Thorbs <KLang-Thorbs@Fernandeztl.com>
**Sent:** Saturday, May 2, 2020 11:48 AM
**To:** Janice Duchaj <jduchaj@ffplaw.com>
**Cc:** John Howell <JHowell@Fernandeztl.com>; Melissa Hunter <Melissa@Fernandeztl.com>; Ben Swart <Ben@Fernandeztl.com>; Tressie Tanner <TTanner@Fernandeztl.com>; Catherine Arpen <CArpen@Fernandeztl.com>; Sabrina Cuddihee <SCuddihee@Fernandeztl.com>; Kimberly Killins <KKillins@Fernandeztl.com>
**Subject:** Re: LEONCE, ROMANUS S VS CJ HESTER INC. - DOCUMENTS IN RESPONSE TO DISCOVERY REQUESTS

## Good Morning, Janice,

I hope this correspondence finds you well. In reviewing the attachments to this correspondence, I could not locate the actual answers to the Interrogatories, just the Notices of Service of Answers to Interrogatories for both Plaintiffs. Please forward the responses to me. Thank you.

Kathi Lang-Thorbs
Legal Assistant to John Moffitt Howell, Esq. and Catherine V. Arpen, Esq.

Fernandez Trial Lawyers, P.A.

8780-200 Perimeter Park Court

Jacksonville, FL 32216



EXHIBIT

C

| | |
|---|---|
| **From:** | Janice Duchaj |
| **Sent:** | Monday, July 20, 2020 4:54 PM |
| **To:** | John Howell; Kathi Lang-Thorbs; Jack Fine |
| **Cc:** | Melissa Hunter; Ben Swart; Tressie Tanner; Catherine Arpen; Sabrina Cuddihee; Kimberly Killins; AngallLeonce.Marcelle1@projects.filevine.com |
| **Subject:** | RE: SERVICE OF COURT DOCUMENT CASE NO.: 1:20-cv-127-AW-GRJ (Marcelle A. Angall-Leonce and Romanus S. Leonce v. On Point Transport and Joseph Misatuli Leia) - PLAINTIFF'S RULE 26 INITIAL DISCLOSURES |
| **Attachments:** | PLAINTIFF'S CERTIFICATE OF NON-OBJECTION TO NPNP SUBPOENA TO BOOST MOBILE.pdf; PLAINTIFF'S RULE 26(a)(1) INITIAL DISCLOSURES.pdf |

Good Afternoon:  Attached please find Plaintiff's Rule 26 Initial Disclosures as well as 2 dropbox links to access the documents.   Let me know if you have trouble downloading.  Thanks, Janice

| COURT IDENTITY: | In the United States District Court for the Northern District of Florida, Gainesville Division |
|---|---|
| Case No.: | 1:20-cv-127-AW-GRJ |
| Initial Parties (Plaintiffs): | Marcelle Ann Angall-Leonce and Romanus Sylvester Leonce |
| Initial Parties (Defendants): | On Point Transport and Joseph Misatuli Leia |
| Title of documents(s) served: | 1. Plaintiffs' Rule 26(a)(1) Initial Disclosures 2. Certificate of Non Objection to Subpoena to Boost Mobile and Subpoena |
| Sending Attorney's Name: | Jack J. Fine, Esq. |
| Sending Attorney's Phone Number: | (352) 372-7777 |
| Date: | July 20, 2020 |

https://www.dropbox.com/sh/eagnigvlwlqx7g1/AABhdWwa_PzDxevfzEQftp60a?dl=0 - Rule 26 disclosure documents not previously provided.

https://www.dropbox.com/sh/k2fq6z43jyuz6py/AADPNN9BE2DLO9DmZGZXwpVta?dl=0 - Rule 26 disclosure documents previously provided to defense on 5/20/20.


Janice Duchaj
Litigation Paralegal
**Fine, Farkash & Parlapiano PA**
622 NE 1st Street
Gainesville, Florida 32601
Tel: 352-372-7777
Toll Free: 800-637-4545
Fax: 877-272-9101

**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT.**



"When Life Changes, We're There"
www.ffplaw.com

NOTICE TO RECIPIENT: This e-mail message is intended only for the individual or entity to which it is addressed and may contain confidential information and/or attachments that are legally privileged. If you are not the intended recipient, any review, use, dissemination, distribution or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify me immediately by return e-mail or by telephone and delete this message. Please note that if this e-mail contains a forwarded message, an attachment, or is in reply to a prior message, some or all of the contents of this message may not have been produced by Fine, Farkash & Parlapiano, P.A.



**Centers for Disease Control and Prevention**

Coronavirus Disease 2019 (COVID-19)

# CDC COVID Data Tracker
Maps, charts, and data provided by the CDC

| Case Trends ▾ | County View | Laboratory ▾ | Community Impact ▾ | Unique Populations ▾ | COVID-19 Home |

Cases and Deaths by State    US and State Trends    Compare State Trends    Demographics    **Trends by Population Factors**    Forecasting

Trends in ED Visits

## Trends in COVID-19 Cases and Deaths in the United States, by County-level Population Factors



**COVID-19 7-Day Case Rate per 100,000 Population, by Metro vs. Non-Metro**

Select US, Region, or State: United States

Select Classification: Metro vs. Non-Metro

View: ● Cases ○ Deaths

Measure: ● New - 7 Days ○ New - 14 Days ○ Cumulative

Metropolitan ✕   Non-Metropolitan ✕   All Counties in the United States ✕

### Data Table for 7-Day Case Rate per 100,000 Population, by Metro vs. Non-Metro

CDC | Updated: Dec 1 2020 12:18PM

**Download Data ⬇**

| Date ⬍ | Metro ⬍ | Non-Metro ⬍ | All US Counties ⬍ |
|---|---|---|---|
| 2020-01-23 | 0 | 0 | 0 |
| 2020-01-24 | 0 | 0 | 0 |
| 2020-01-25 | 0 | 0 | 0 |
| 2020-01-26 | 0 | 0 | 0 |
| 2020-01-27 | 0 | 0 | 0 |
| 2020-01-28 | 0 | 0 | 0 |
| 2020-01-29 | 0 | 0 | 0 |
| 2020-01-30 | 0 | 0 | 0 |



EXHIBIT D

| Date ⇕ | Metro ⇕ | Non-Metro ⇕ | All US Counties ⇕ |
|---|---|---|---|
| 2020-01-30 | 0 | 0 | 0 |
| 2020-01-31 | 0 | 0 | 0 |
| 2020-02-01 | 0 | 0 | 0 |
| 2020-02-02 | 0 | 0 | 0 |
| 2020-02-03 | 0 | 0 | 0 |
| 2020-02-04 | 0 | 0 | 0 |
| 2020-02-05 | 0 | 0 | 0 |
| 2020-02-06 | 0 | 0 | 0 |
| 2020-02-07 | 0 | 0 | 0 |
| 2020-02-08 | 0 | 0 | 0 |
| 2020-02-09 | 0 | 0 | 0 |
| 2020-02-10 | 0 | 0 | 0 |
| 2020-02-11 | 0 | 0 | 0 |
| 2020-02-12 | 0 | 0 | 0 |
| 2020-02-13 | 0 | 0 | 0 |
| 2020-02-14 | 0 | 0 | 0 |
| 2020-02-15 | 0 | 0 | 0 |
| 2020-02-16 | 0 | 0 | 0 |
| 2020-02-17 | 0 | 0 | 0 |
| 2020-02-18 | 0 | 0 | 0 |
| 2020-02-19 | 0 | 0 | 0 |
| 2020-02-20 | 0 | 0 | 0 |
| 2020-02-21 | 0 | 0 | 0 |
| 2020-02-22 | 0 | 0 | 0 |
| 2020-02-23 | 0 | 0 | 0 |
| 2020-02-24 | 0 | 0 | 0 |
| 2020-02-25 | 0 | 0 | 0 |
| 2020-02-26 | 0 | 0 | 0 |
| 2020-02-27 | 0 | 0 | 0 |
| 2020-02-28 | 0 | 0 | 0 |
| 2020-02-29 | 0 | 0 | 0 |
| 2020-03-01 | 0 | 0 | 0 |
| 2020-03-02 | 0 | 0 | 0 |
| 2020-03-03 | 0.01 | 0 | 0.01 |
| 2020-03-04 | 0.01 | 0 | 0.01 |
| 2020-03-05 | 0.01 | 0.01 | 0.01 |
| 2020-03-06 | 0.01 | 0.01 | 0.01 |
| 2020-03-07 | 0.02 | 0.01 | 0.02 |
| 2020-03-08 | 0.03 | 0.01 | 0.03 |
| 2020-03-09 | 0.04 | 0.01 | 0.04 |
| 2020-03-10 | 0.05 | 0.01 | 0.05 |
| 2020-03-11 | 0.06 | 0.02 | 0.06 |
| 2020-03-12 | 0.08 | 0.03 | 0.07 |
| 2020-03-13 | 0.11 | 0.04 | 0.1 |
| 2020-03-14 | 0.14 | 0.05 | 0.13 |
| 2020-03-15 | 0.16 | 0.06 | 0.15 |
| 2020-03-16 | 0.2 | 0.07 | 0.18 |
| 2020-03-17 | 0.27 | 0.09 | 0.25 |
| 2020-03-18 | 0.41 | 0.11 | 0.37 |
| 2020-03-19 | 0.63 | 0.15 | 0.56 |
| 2020-03-20 | 0.84 | 0.19 | 0.75 |
| 2020-03-21 | 1.16 | 0.24 | 1.03 |
| 2020-03-22 | 1.48 | 0.31 | 1.31 |
| 2020-03-23 | 1.92 | 0.4 | 1.71 |
| 2020-03-24 | 2.32 | 0.5 | 2.06 |
| 2020-03-25 | 2.87 | 0.62 | 2.55 |

| Date ⬍ | Metro ⬍ | Non-Metro ⬍ | All US Counties ⬍ |
|---|---|---|---|
| 2020-03-25 | 2.87 | 0.62 | 2.55 |
| 2020-03-26 | 3.42 | 0.77 | 3.03 |
| 2020-03-27 | 3.99 | 0.9 | 3.56 |
| 2020-03-28 | 4.6 | 1.06 | 4.1 |
| 2020-03-29 | 5.11 | 1.21 | 4.56 |
| 2020-03-30 | 5.64 | 1.39 | 5.04 |
| 2020-03-31 | 6.3 | 1.56 | 5.63 |
| 2020-04-01 | 6.79 | 1.76 | 6.08 |
| 2020-04-02 | 7.38 | 1.94 | 6.62 |
| 2020-04-03 | 8.31 | 2.16 | 7.44 |
| 2020-04-04 | 8.98 | 2.31 | 8.04 |
| 2020-04-05 | 9.36 | 2.41 | 8.38 |
| 2020-04-06 | 9.8 | 2.56 | 8.78 |
| 2020-04-07 | 10.18 | 2.77 | 9.14 |
| 2020-04-08 | 10.59 | 2.82 | 9.5 |
| 2020-04-09 | 10.83 | 2.94 | 9.72 |
| 2020-04-10 | 10.72 | 3.02 | 9.63 |
| 2020-04-11 | 10.57 | 3.07 | 9.51 |
| 2020-04-12 | 10.62 | 3.09 | 9.56 |
| 2020-04-13 | 10.35 | 3.09 | 9.33 |
| 2020-04-14 | 10.07 | 2.98 | 9.08 |
| 2020-04-15 | 9.93 | 3.05 | 8.96 |
| 2020-04-16 | 9.85 | 3.14 | 8.91 |
| 2020-04-17 | 9.71 | 3.21 | 8.8 |
| 2020-04-18 | 9.53 | 3.42 | 8.67 |
| 2020-04-19 | 9.41 | 3.82 | 8.62 |
| 2020-04-20 | 9.48 | 3.91 | 8.7 |
| 2020-04-21 | 9.43 | 4.06 | 8.67 |
| 2020-04-22 | 9.32 | 4.2 | 8.6 |
| 2020-04-23 | 9.25 | 4.37 | 8.57 |
| 2020-04-24 | 9.52 | 4.74 | 8.85 |
| 2020-04-25 | 9.79 | 5 | 9.11 |
| 2020-04-26 | 9.8 | 4.83 | 9.1 |
| 2020-04-27 | 9.62 | 5.06 | 8.98 |
| 2020-04-28 | 9.54 | 5.19 | 8.93 |
| 2020-04-29 | 9.45 | 5.29 | 8.87 |
| 2020-04-30 | 9.33 | 5.41 | 8.77 |
| 2020-05-01 | 9.11 | 5.42 | 8.59 |
| 2020-05-02 | 8.9 | 5.28 | 8.39 |
| 2020-05-03 | 8.85 | 5.31 | 8.35 |
| 2020-05-04 | 8.78 | 5.24 | 8.28 |
| 2020-05-05 | 8.72 | 5.34 | 8.25 |
| 2020-05-06 | 8.58 | 5.33 | 8.12 |
| 2020-05-07 | 8.47 | 5.36 | 8.03 |
| 2020-05-08 | 8.17 | 5.24 | 7.76 |
| 2020-05-09 | 7.97 | 5.22 | 7.58 |
| 2020-05-10 | 7.71 | 5.21 | 7.36 |
| 2020-05-11 | 7.59 | 5.07 | 7.23 |
| 2020-05-12 | 7.52 | 4.9 | 7.15 |
| 2020-05-13 | 7.35 | 4.99 | 7.01 |
| 2020-05-14 | 7.33 | 4.9 | 6.99 |
| 2020-05-15 | 7.21 | 4.91 | 6.89 |
| 2020-05-16 | 7.18 | 4.89 | 6.86 |
| 2020-05-17 | 7.14 | 4.81 | 6.82 |
| 2020-05-18 | 7.2 | 4.92 | 6.88 |
| 2020-05-19 | 7.16 | 4.95 | 6.85 |

| Date ⇕ | Metro ⇕ | Non-Metro ⇕ | All US Counties ⇕ |
|---|---|---|---|
| 2020-05-19 | 7.16 | 4.95 | 6.85 |
| 2020-05-20 | 7.25 | 4.85 | 6.9 |
| 2020-05-21 | 7.18 | 4.97 | 6.87 |
| 2020-05-22 | 7.11 | 5.03 | 6.82 |
| 2020-05-23 | 6.98 | 5.09 | 6.71 |
| 2020-05-24 | 7.03 | 5.23 | 6.77 |
| 2020-05-25 | 6.94 | 5.21 | 6.69 |
| 2020-05-26 | 6.82 | 5.15 | 6.58 |
| 2020-05-27 | 6.58 | 5.42 | 6.41 |
| 2020-05-28 | 6.42 | 5.3 | 6.26 |
| 2020-05-29 | 6.49 | 5.36 | 6.33 |
| 2020-05-30 | 6.53 | 5.41 | 6.37 |
| 2020-05-31 | 6.52 | 5.61 | 6.39 |
| 2020-06-01 | 6.57 | 5.68 | 6.44 |
| 2020-06-02 | 6.61 | 5.96 | 6.51 |
| 2020-06-03 | 6.69 | 5.84 | 6.57 |
| 2020-06-04 | 6.68 | 5.92 | 6.57 |
| 2020-06-05 | 6.83 | 5.94 | 6.71 |
| 2020-06-06 | 6.83 | 5.92 | 6.7 |
| 2020-06-07 | 6.77 | 5.66 | 6.61 |
| 2020-06-08 | 6.66 | 5.69 | 6.52 |
| 2020-06-09 | 6.63 | 5.51 | 6.47 |
| 2020-06-10 | 6.65 | 5.57 | 6.5 |
| 2020-06-11 | 6.66 | 5.5 | 6.5 |
| 2020-06-12 | 6.5 | 5.62 | 6.38 |
| 2020-06-13 | 6.57 | 5.74 | 6.45 |
| 2020-06-14 | 6.62 | 5.84 | 6.51 |
| 2020-06-15 | 6.68 | 5.86 | 6.56 |
| 2020-06-16 | 6.93 | 6.26 | 6.84 |
| 2020-06-17 | 7.13 | 6.27 | 7.01 |
| 2020-06-18 | 7.37 | 6.37 | 7.23 |
| 2020-06-19 | 7.65 | 6.39 | 7.47 |
| 2020-06-20 | 8.02 | 6.36 | 7.79 |
| 2020-06-21 | 8.43 | 6.47 | 8.15 |
| 2020-06-22 | 8.92 | 6.9 | 8.64 |
| 2020-06-23 | 9.45 | 7.03 | 9.11 |
| 2020-06-24 | 9.94 | 7.37 | 9.58 |
| 2020-06-25 | 10.45 | 7.7 | 10.06 |
| 2020-06-26 | 11.18 | 7.98 | 10.73 |
| 2020-06-27 | 11.71 | 8.16 | 11.21 |
| 2020-06-28 | 12.23 | 8.38 | 11.69 |
| 2020-06-29 | 12.61 | 8.42 | 12.02 |
| 2020-06-30 | 13.21 | 8.7 | 12.57 |
| 2020-07-01 | 13.9 | 8.98 | 13.21 |
| 2020-07-02 | 14.6 | 9.41 | 13.87 |
| 2020-07-03 | 14.92 | 9.69 | 14.19 |
| 2020-07-04 | 15.07 | 9.96 | 14.35 |
| 2020-07-05 | 15.68 | 9.91 | 14.87 |
| 2020-07-06 | 16.13 | 10.22 | 15.3 |
| 2020-07-07 | 16.44 | 10.45 | 15.59 |
| 2020-07-08 | 16.82 | 10.87 | 15.98 |
| 2020-07-09 | 17.19 | 11.43 | 16.38 |
| 2020-07-10 | 17.87 | 12.18 | 17.07 |
| 2020-07-11 | 18.43 | 12.93 | 17.65 |
| 2020-07-12 | 18.7 | 13.4 | 17.96 |
| 2020-07-13 | 19.11 | 13.7 | 18.35 |

| Date ⇕ | Metro ⇕ | Non-Metro ⇕ | All US Counties ⇕ |
|---|---|---|---|
| 2020-07-13 | 19.11 | 13.7 | 18.33 |
| 2020-07-14 | 19.65 | 14.31 | 18.9 |
| 2020-07-15 | 19.99 | 14.84 | 19.26 |
| 2020-07-16 | 20.69 | 15.1 | 19.9 |
| 2020-07-17 | 20.67 | 15.01 | 19.88 |
| 2020-07-18 | 20.77 | 15.06 | 19.97 |
| 2020-07-19 | 20.89 | 15.49 | 20.13 |
| 2020-07-20 | 20.9 | 15.85 | 20.18 |
| 2020-07-21 | 20.75 | 16.28 | 20.12 |
| 2020-07-22 | 20.74 | 16.23 | 20.1 |
| 2020-07-23 | 20.25 | 16.46 | 19.72 |
| 2020-07-24 | 20.32 | 16.94 | 19.85 |
| 2020-07-25 | 20.47 | 17.39 | 20.04 |
| 2020-07-26 | 20.11 | 17.68 | 19.77 |
| 2020-07-27 | 20.13 | 17.79 | 19.8 |
| 2020-07-28 | 20.06 | 17.74 | 19.73 |
| 2020-07-29 | 20.01 | 17.92 | 19.72 |
| 2020-07-30 | 19.99 | 18.08 | 19.72 |
| 2020-07-31 | 19.75 | 17.92 | 19.5 |
| 2020-08-01 | 19.39 | 17.65 | 19.15 |
| 2020-08-02 | 19.06 | 17.2 | 18.8 |
| 2020-08-03 | 18.46 | 16.79 | 18.23 |
| 2020-08-04 | 17.87 | 16.53 | 17.68 |
| 2020-08-05 | 17.2 | 16.39 | 17.09 |
| 2020-08-06 | 16.63 | 16.12 | 16.55 |
| 2020-08-07 | 16.2 | 16.39 | 16.22 |
| 2020-08-08 | 15.98 | 16.54 | 16.06 |
| 2020-08-09 | 15.89 | 16.88 | 16.03 |
| 2020-08-10 | 15.9 | 16.85 | 16.04 |
| 2020-08-11 | 15.98 | 16.54 | 16.06 |
| 2020-08-12 | 15.97 | 16.53 | 16.05 |
| 2020-08-13 | 15.81 | 16.53 | 15.91 |
| 2020-08-14 | 15.84 | 16.31 | 15.91 |
| 2020-08-15 | 15.61 | 16.03 | 15.67 |
| 2020-08-16 | 15.51 | 15.69 | 15.53 |
| 2020-08-17 | 15.07 | 15.24 | 15.09 |
| 2020-08-18 | 14.54 | 14.89 | 14.59 |
| 2020-08-19 | 14.11 | 14.65 | 14.18 |
| 2020-08-20 | 13.7 | 14.27 | 13.78 |
| 2020-08-21 | 13.3 | 13.96 | 13.39 |
| 2020-08-22 | 13 | 14 | 13.15 |
| 2020-08-23 | 12.52 | 13.79 | 12.7 |
| 2020-08-24 | 12.52 | 14.07 | 12.74 |
| 2020-08-25 | 12.35 | 14.21 | 12.61 |
| 2020-08-26 | 12.37 | 14.25 | 12.64 |
| 2020-08-27 | 12.39 | 14.72 | 12.72 |
| 2020-08-28 | 12.17 | 14.91 | 12.55 |
| 2020-08-29 | 12.06 | 14.94 | 12.47 |
| 2020-08-30 | 12.1 | 15.28 | 12.55 |
| 2020-08-31 | 11.91 | 15.53 | 12.42 |
| 2020-09-01 | 12.13 | 15.62 | 12.62 |
| 2020-09-02 | 11.92 | 15.69 | 12.45 |
| 2020-09-03 | 11.89 | 15.4 | 12.38 |
| 2020-09-04 | 12.04 | 15.86 | 12.58 |
| 2020-09-05 | 12.12 | 15.78 | 12.64 |
| 2020-09-06 | 11.94 | 15.59 | 12.45 |

| Date ⇕ | Metro ⇕ | Non-Metro ⇕ | All US Counties ⇕ |
|---|---|---|---|
| 2020-09-06 | 11.94 | 15.59 | 12.45 |
| 2020-09-07 | 11.57 | 14.94 | 12.15 |
| 2020-09-08 | 10.98 | 14.14 | 11.42 |
| 2020-09-09 | 10.72 | 13.76 | 11.15 |
| 2020-09-10 | 10.45 | 13.47 | 10.88 |
| 2020-09-11 | 10.25 | 13 | 10.64 |
| 2020-09-12 | 10.09 | 12.99 | 10.5 |
| 2020-09-13 | 10.21 | 13.13 | 10.62 |
| 2020-09-14 | 10.48 | 13.74 | 10.94 |
| 2020-09-15 | 11.14 | 14.8 | 11.66 |
| 2020-09-16 | 11.34 | 15.3 | 11.9 |
| 2020-09-17 | 11.56 | 15.77 | 12.16 |
| 2020-09-18 | 11.64 | 16.16 | 12.28 |
| 2020-09-19 | 11.72 | 16.44 | 12.39 |
| 2020-09-20 | 11.73 | 16.73 | 12.43 |
| 2020-09-21 | 12.47 | 17.49 | 13.18 |
| 2020-09-22 | 12.17 | 17.36 | 12.9 |
| 2020-09-23 | 12.18 | 17.64 | 12.95 |
| 2020-09-24 | 12.12 | 17.83 | 12.92 |
| 2020-09-25 | 12.3 | 18.65 | 13.2 |
| 2020-09-26 | 12.39 | 18.93 | 13.31 |
| 2020-09-27 | 12.42 | 18.91 | 13.33 |
| 2020-09-28 | 11.59 | 18.23 | 12.52 |
| 2020-09-29 | 11.75 | 18.53 | 12.71 |
| 2020-09-30 | 11.85 | 18.65 | 12.81 |
| 2020-10-01 | 11.94 | 19.04 | 12.94 |
| 2020-10-02 | 11.87 | 18.59 | 12.82 |
| 2020-10-03 | 12.05 | 18.84 | 13.01 |
| 2020-10-04 | 12.08 | 18.88 | 13.04 |
| 2020-10-05 | 12.25 | 19.29 | 13.24 |
| 2020-10-06 | 12.24 | 19.6 | 13.28 |
| 2020-10-07 | 12.58 | 20.08 | 13.64 |
| 2020-10-08 | 13 | 20.54 | 14.06 |
| 2020-10-09 | 13.14 | 21.18 | 14.28 |
| 2020-10-10 | 13.28 | 22.13 | 14.52 |
| 2020-10-11 | 13.59 | 22.82 | 14.89 |
| 2020-10-12 | 13.84 | 23.17 | 15.16 |
| 2020-10-13 | 14.25 | 23.28 | 15.52 |
| 2020-10-14 | 14.55 | 24.11 | 15.9 |
| 2020-10-15 | 14.83 | 24.89 | 16.25 |
| 2020-10-16 | 15.28 | 25.55 | 16.73 |
| 2020-10-17 | 15.44 | 25.26 | 16.82 |
| 2020-10-18 | 15.64 | 25.32 | 17.01 |
| 2020-10-19 | 16.19 | 26.26 | 17.61 |
| 2020-10-20 | 16.49 | 27.27 | 18.01 |
| 2020-10-21 | 16.67 | 27.4 | 18.18 |
| 2020-10-22 | 17.16 | 27.69 | 18.65 |
| 2020-10-23 | 17.55 | 28.26 | 19.06 |
| 2020-10-24 | 18.45 | 29.69 | 20.04 |
| 2020-10-25 | 18.91 | 30.53 | 20.54 |
| 2020-10-26 | 19.37 | 30.66 | 20.96 |
| 2020-10-27 | 20 | 31.22 | 21.58 |
| 2020-10-28 | 20.73 | 32.07 | 22.33 |
| 2020-10-29 | 21.21 | 32.91 | 22.86 |
| 2020-10-30 | 22.08 | 34.11 | 23.77 |
| 2020-10-31 | 22.33 | 34.62 | 24.06 |

| Date | Metro | Non-Metro | All US Counties |
|------|-------|-----------|-----------------|
| 2020-10-31 | 22.55 | 34.62 | 24.06 |
| 2020-11-01 | 22.59 | 35.04 | 24.0 |
| 2020-11-02 | 23.52 | 36.04 | 25.28 |
| 2020-11-03 | 24.2 | 37.2 | 26.03 |
| 2020-11-04 | 25.23 | 38.48 | 27.1 |
| 2020-11-05 | 26.59 | 40.34 | 28.52 |
| 2020-11-06 | 27.97 | 42.52 | 30.02 |
| 2020-11-07 | 29.64 | 44.61 | 31.75 |
| 2020-11-08 | 31.03 | 46.35 | 33.19 |
| 2020-11-09 | 32.65 | 48.66 | 34.91 |
| 2020-11-10 | 34.6 | 51.09 | 36.92 |
| 2020-11-11 | 36.17 | 53.51 | 38.61 |
| 2020-11-12 | 37.78 | 55.23 | 40.24 |
| 2020-11-13 | 39.36 | 57.34 | 41.89 |
| 2020-11-14 | 40.86 | 59.67 | 43.51 |
| 2020-11-15 | 42.38 | 61.8 | 45.11 |
| 2020-11-16 | 43.84 | 63.35 | 46.59 |
| 2020-11-17 | 44.73 | 64.56 | 47.52 |
| 2020-11-18 | 45.91 | 65.8 | 48.72 |
| 2020-11-19 | 47.15 | 67.15 | 49.97 |
| 2020-11-20 | 47.99 | 68.34 | 50.86 |
| 2020-11-21 | 48.45 | 67.78 | 51.17 |
| 2020-11-22 | 48.46 | 67.56 | 51.15 |
| 2020-11-23 | 49.13 | 67.98 | 51.79 |
| 2020-11-24 | 49.79 | 67.58 | 52.3 |
| 2020-11-25 | 50.28 | 67.84 | 52.77 |
| 2020-11-26 | 47.15 | 63.52 | 49.48 |
| 2020-11-27 | 47.83 | 61.74 | 49.74 |
| 2020-11-28 | 47.13 | 60.57 | 49.06 |
| 2020-11-29 | 41.19 | 52.84 | 49.01 |

View and Download COVID-19 Case Surveillance Public Use Data

**Data Sources, References & Notes:** Case and death data courtesy of USAFacts.org downloaded each day at 4:00pm EST or when earliest update is available. Refer to USAFacts.org for data collection and processing methodology. Official verified statistics from CDC are provided on the US Cases page.

Urban/rural classification type is based on the 2013 National Center of Health Statistics (NCHS) Urban-Rural Classification Scheme for Counties (https://www.cdc.gov/nchs/data_access/urban_rural.htm). Metro vs. Metro vs. Non-Metro classification type is an aggregation of the 6 NCHS Urban-Rural classifications, where Metro counties include Large Central Metro, Large Fringe Metro, Medium Metro, and Small Metro and Non-Metro counties include Micropolitan and Non-Core (Rural).

2018 Vintage Census Population Estimates and American Community Survey data were used to calculate rates and to classify counties based on their distribution by age, race, ethnicity, household size, poverty level, and insurance status. Cut points were generated by using tertiles and organized into High, Moderate, and Low percentage categories.

COVID-19 Community Vulnerability Index (CCVI) generated by the Surgo Foundation (https://precisionforcovid.org/cases). Counties classified into High, Moderate, and Low Vulnerability categories represent CCVI scores of 0.667-1, 0.334-0.666, and 0-0.333, respectively.

Social Vulnerability Index (SVI) generated by CDC/ATSDR's Geospatial Research, Analysis & Service Program and are developed using Census 2010 and American Community Survey Data. (https://www.atsdr.cdc.gov/placeandhealth/svi/index.html). Counties classified into High, Moderate, and Low Vulnerability categories represent SVI scores of 0.667-1, 0.334-0.666, and 0-0.333, respectively.



HAVE QUESTIONS?

Visit CDC-INFO

Call 800-232-4636



✉  Email CDC-INFO

🕐  Open 24/7

**CDC INFORMATION**

About CDC

Jobs

Funding

Policies

File Viewers & Players

Privacy

FOIA

No Fear Act

OIG

Nondiscrimination

Accessibility

**CONNECT WITH CDC**

U.S. Department of Health & Human Services

USA.gov

CDC Website Exit Disclaimer ↗


Centers for Disease
Control and Prevention



WEAR A MASK.

# How to Protect Yourself & Others

## Coronavirus Disease 2019 (COVID-19)


MENU ›

Older adults and people who have certain underlying conditions like heart or lung disease or diabetes are at increased risk of severe illness from COVID-19 illness. More information on Are you at higher risk for serious illness.



## Know how it spreads

- COVID-19 spreads easily from person to person, mainly by the following routes:
  - Between people who are in close contact with one another (within 6 feet).
  - Through respiratory droplets produced when an infected person coughs, sneezes, breathes, sings or talks.
    - Respiratory droplets cause infection when they are inhaled or deposited on mucous membranes, such as those that line the inside of the nose and mouth.
- People who are infected but do not have symptoms can also spread the virus to others.

### Less common ways COVID-19 can spread

- Under certain circumstances (for example, when people are in enclosed spaces with poor ventilation), COVID-19 can sometimes be spread by airborne transmission.
- COVID-19 spreads less commonly through contact with contaminated surfaces.

## Everyone Should



## Wash your hands often

- Wash your hands often with soap and water for at least 20 seconds especially after you have been in a public place, or after blowing your nose, coughing, or sneezing.
- It's especially important to wash:
  - Before eating or preparing food
  - Before touching your face
  - After using the restroom
  - After leaving a public place
  - After blowing your nose, coughing, or sneezing
  - After handling your mask
  - After changing a diaper
  - After caring for someone sick


EXHIBIT
E

- After caring for someone sick
   - After touching animals or pets
- If soap and water are not readily available, **use a hand sanitizer that contains at least 60% alcohol**. Cover all surfaces of your hands and rub them together until they feel dry.
- **Avoid touching your eyes, nose, and mouth** with unwashed hands.



## Avoid close contact

- **Inside your home:** Avoid close contact with people who are sick.
   - If possible, maintain 6 feet between the person who is sick and other household members.
- **Outside your home:** Put 6 feet of distance between yourself and people who don't live in your household.
   - Remember that some people without symptoms may be able to spread virus.
   - Stay at least 6 feet (about 2 arms' length) from other people.
   - Keeping distance from others is especially important for people who are at higher risk of getting very sick.



## Cover your mouth and nose with a mask when around others

- Masks help prevent you from getting or spreading the virus.
- You could spread COVID-19 to others even if you do not feel sick.
- Everyone should wear a mask in public settings and when around people who don't live in your household, especially when other social distancing measures are difficult to maintain.
   - Masks should not be placed on young children under age 2, anyone who has trouble breathing, or is unconscious, incapacitated or otherwise unable to remove the mask without assistance.
- Do NOT use a mask meant for a healthcare worker. Currently, surgical masks and N95 respirators are critical supplies that should be reserved for healthcare workers and other first responders.
- Continue to keep about 6 feet between yourself and others. The mask is not a substitute for social distancing.



## Cover coughs and sneezes

- **Always cover your mouth and nose** with a tissue when you cough or sneeze or use the inside of your elbow and do not spit.
- **Throw used tissues** in the trash.
- Immediately **wash your hands** with soap and water for at least 20 seconds. If soap and water are not readily available, clean your hands with a hand sanitizer that contains at least 60% alcohol.



## Clean and disinfect

- **Clean AND disinfect** frequently touched surfaces **daily**. This includes tables, doorknobs, light switches, countertops, handles, desks, phones, keyboards, toilets, faucets, and sinks.
- **If surfaces are dirty, clean them.** Use detergent or soap and water prior to disinfection.
- **Then, use a household disinfectant.** Most common EPA-registered household disinfectants [↗]  will work.



## Monitor Your Health Daily

- **Be alert for symptoms.** Watch for fever, cough, shortness of breath, or other symptoms of COVID-19.

- Especially important if you are running essential errands, going into the office or workplace, and in settings where it may be difficult to keep a physical distance of 6 feet.
- **Take your temperature** if symptoms develop.
  - Don't take your temperature within 30 minutes of exercising or after taking medications that could lower your temperature, like acetaminophen.
- Follow CDC guidance if symptoms develop.

---



## Protect Your Health This Flu Season

It's likely that flu viruses and the virus that causes COVID-19 will **both** spread this fall and winter. Healthcare systems could be overwhelmed treating both patients with flu and patients with COVID-19. This means getting a flu vaccine during 2020-2021 is more important than ever.

While getting a flu vaccine will not protect against COVID-19 there are many important benefits, such as:

1. Flu vaccines have been shown to reduce the risk of flu illness, hospitalization, and death.
2. Getting a flu vaccine can also save healthcare resources for the care of patients with COVID-19.

### I wear a mask because...

CDC staff give their reasons for wearing a mask.

Wear a mask because...



## Stop the Spread of Germs

### Robert R. Redfield, MD | #COVIDStopsWithMe

CDC Director Robert R. Redfield, MD discusses how we can slow the spread of COVID-19.

### COVID-19 Stop the Spread of Germs

Help stop the spread of COVID-19 and other respiratory illnesses by following these steps.

## Handwashing Resources

View handwashing video in Spanish

View handwashing video in French

 Handwashing tips



## Hand Hygiene in Healthcare Settings

---

## More information

Symptoms

What to do if you are sick

If someone in your house gets sick

Frequently asked questions

Travelers

Individuals, schools, events, businesses and more

Healthcare Professionals

10 Things You Can Do to Manage COVID-19 at Home

10 Things You Can Do to Manage COVID-19 at Home (ASL Version)

Social Distancing (ASL Video)

ASL Video Series: What You Need to Know About Handwashing

Last Updated Nov. 27, 2020